Good morning and may it please the Court. Matthew Allen of Nichols-Castor for the Plaintiffs Appellants. I'd like to reserve three minutes of time for rebuttal. Courts across the country and the Department of Labor have long looked to this Court's BNEC decision as the seminal joint employment case under the Fair Labor Standards Act. We are here today discussing the same type of employees who are at issue in BNEC, home care providers in the IHSS program. BNEC held that the state and county defendants jointly employed these providers under the FLSA, recognizing that counties and the state exercised considerable control over the nature and structure of the employment relationship. The District Court went the other way in this case, holding that Los Angeles County does not employ IHSS providers under the FLSA. That decision was an error. There simply is not enough daylight between the facts here and the facts in BNEC to warrant the departure from a case that is so firmly entrenched in the bedrock of FLSA jurisprudence. The District Court also erred in denying judgment to the plaintiffs on the county's good faith defense and in granting judgment to the county on willfulness. I'd like to start with a few big picture points. First, this is an appeal from summary judgment, meaning review is de novo. The county argues a clearly erroneous standard should apply to the District Court's fact-finding, but the county relies on cases that were on appeal after a bench trial, which is not the posture here. On appeal from summary judgment, the court is not bound by the District Court's view of the facts, and here we respectfully submit that the District Court was just wrong in how it applied the facts, the undisputed facts, to BNEC. Second, BNEC relies on a totality-of-the-circumstances approach to the joint-employment question. The factors provide a useful framework, but they are not to be blindly applied. The District Court erred by viewing each factor through a binary lens, requiring a showing that the county maintained primary or exclusive control over that particular factor in order for the factor to be tallied in the employer column. It did so at the expense of overarching considerations of the economic realities of the relationship. The regulations that this Court cited in BNEC, which are still in effect during the time period covered here, shows why the mechanical application of the factors is contrary to the FLSA's joint-employment principles. Under 29 CFR Section 7981.2a.2, there is joint-employment when one employer acts directly or indirectly in the interests of another employer in relation to the employee. And under subsection 3 of the same regulation, there is joint- That's sort of circular because the question is, what's an employer? So, it isn't the case, as I understand it, that everybody who works for the county, for example, was an agent of the county carrying out the county's duties here as an employer of the workers here, right? In other words, it can't be that- You can't turn it backwards so that everybody who was an agent is an employer. Well, we're talking about the entities that are- I understand that, but I'm just pointing out that this argument is a little overblown because individuals can be employers too, but the individuals who work for the entities are not the employer. Well, there's a separate test jar for individual liability under the FLSA, and it's totally different factors that are separate and distinct from the joint-employment principles that this Court outlined in BINET. And so, the question would be different for individual liability than for liability as a joint-employer. But being an agent doesn't make an employer, does it? An agent of an employer doesn't make an employer. We would agree with that, Your Honor. But when we're looking at two different entities, we're looking at the ways in which those two entities jointly work to control the employment of a particular employee. The other thing that I think is worse than BINET, and you know about the fairly strong argument with regard to BINET, but it is true, as L.A. County says, that the relationship between the county and the state was not the focus of BINET. It was whether the county and the state sort of looked at together versus the recipient or the employer. I know there's a sentence in BINET at the end that says that they reach their employers, but that wasn't the focus of the BINET. Well, I have two responses on that, Your Honor. First of all, the state and the counties could have separately argued that one or the other was not an employer, and they didn't. And second, I think it does go to the nature and structure of the IHSS program. The IHSS program can't work without the counties. The state can't be everywhere at once. The state designs the policies and the procedures, but it turns to the counties to implement those and to perform the day-to-day employment activities. But, Counselor, that doesn't make the county an employer, because they have been delegated responsibilities by the state. So that would mean that by the time someone is delegated administrative responsibilities, they become employers. They can't be right. Well, I think the important point, Your Honor, is what type of activities are delegated. And if the delegated activities are employment-related activities, as they are here, then it certainly does make the delegated company an employer. It's interesting in the joint employment cases, many of them actually do arise in the health care context, and oftentimes we're looking at non-related entities that are bound by contract. And this really is different, because this is more of a vertical relationship between the state and the county. It's more akin to a parent-subsidiary relationship. And in those types of cases, there's often no dispute that the subsidiary is an employer, because the subsidiary is. Well, just because one is a subsidiary doesn't automatically make them a joint employer. That's the difficulty I'm having with this case, is how just because the state has assigned some responsibilities to the county in this program, they become employers, especially when it's pretty much uncontested that the employer is actually the recipient of the services. So that puts a wrinkle on it, I think. Well, I would say, Your Honor, if there's a joint parent-subsidiary relationship and the day-to-day employer activities are delegated to the subsidiary by the parent in all cases, that subsidiary would be an employer under that principle as well. No, so let's see this clearly. What we've learned is that the recipient is not the sole employer. That's correct. And there are three entities at play here. The state, the county, and the recipient. So can you give me a kind of a bullet point list of what the things are that the county does that makes it a joint employer? Certainly, and so many of them, Your Honor, are the same as they were to begin with. Just the list. Okay. The county determines the tasks that the providers will perform and the amount of time that's going to be spent on those tasks. The county social worker goes into the recipient's home, determines what care is necessary, and determines the amount of time spent on the task. The county points to guidelines on that. There's a wide range in the amount of time that the county social worker can approve for a particular task. Counsel, who sets those guidelines? The state sets those guidelines, but we point out in our brief, Your Honor, the wide range within the guidelines. And so the county social worker decides whether the recipient is a one, two, three, or five on a scale, and the county social worker's determination could result in the recipient being approved for anywhere between minutes of services per week to hours of services per week. And that decision is solely made by the county social worker. And, again, there's no difference between that fact as it exists today and the fact as it existed in the net. So that's one of the facts. In the context of that decision, the county determines the total number of hours to be worked each month. The county approves deviations from those hours. But it doesn't determine, actually, the total number of hours any provider is to work, because a provider can work for more than one recipient, right? That is true, Your Honor, but it determines, the county determines, how many hours of services a particular recipient will receive. And, again, that fact is no different now than it was in the net. The county approves deviations from the approved number of hours, especially if that deviation will result in overtime. The county alone makes that determination. The county delivered provider orientation in the lead-up to the implementation of the FLSA requirements. What do they think? I mean, there is some, again, supervision by the state as to the training, but I believe the record shows that it was the county that produced the training materials. Is that right? The county delivered the training materials, and the county designed some of the training materials, especially with respect to the FLSA implementation. The county reviewed FLSA violations and determined whether to uphold those violations. The county inspected the home, which is the provider's place of employment. The county chose the method of delivering the services, and this is an important point. This really confuses me, because what confuses me is not that the county chose, and I understand that, but everybody is characterizing this is the third category, and everybody seems happy to do that. But, in fact, the language of the third category is giving the money to the recipients, and they're not giving the money to the recipients. Your Honor, I shared your conclusion. And that was from Bennett, too. And Bennett did say that it was Category 3, and recognized that in some instances the money was paid directly by the county. I mean, I don't know why this seems to be, you know, kind of the inside understanding, but it doesn't fit the language very well. Avery, Your Honor, direct pay is pornographically here for that third piece. There's a portion in Bennett that helped me understand it. The counties of Bennett all chose this third method, but they implemented it in different ways. And so, during the time period covered by Bennett, the district court decided that in Bennett they were paying the recipients directly, but that's not true. Some of them were, and some of them weren't. That's correct. The district court said it was the first method, and the first method, I believe, is most clearly understood as direct civil service county employees. So, I think the confusion stems from the fact that the direct pay method, the third method, was actually executed three different ways in Bennett. Sometimes there were two-party checks issued to the recipient and the provider. Sometimes there were checks issued directly to the recipient with the understanding that the recipient would pay the provider. And then sometimes there were checks issued directly to the provider. But those were all within the direct pay method. And this court said in Bennett that the manner that the checks were delivered to the provider didn't make a difference. And, in our view, that's a key error below, is that the district court focused so heavily on the fact that the state controls the payroll. And the outsourcing of payroll under the FLSA simply cannot be a basis for distinguishing from Bennett because any number of counts of employers outsource. As a matter of fact, the state does control the payroll for the program. The county does not control the payroll at all. Correct. But as to the amount of it, two other things. The county pays a big chunk of the money that is paid by the state. In other words, the county is sending money to the state, which the state is then using, aggregating with its money and then processing the payroll. But there's a big chunk of county money in there. That's correct. There are hundreds of millions of dollars a year. And that's why, in our view, the actual entity that delivers the check shouldn't affect the analysis. Secondly, the county has the authority, and in some instances has, to set the rate of pay through collective bargaining. That's correct. Through collective bargaining and through Board of Supervisors action, which happened here. The state has to approve it. Do we have anything in the record as to whether the state has ever disapproved it? I am not aware of anything in the record of the state disapproving anything. Can I ask a question about willfulness? And I think it also relates to the liquidated damages issue. So if the state's the one that's cutting the check and you're contending that the county acted willfully, that's the willfulness issue, and you're contending that they didn't act in good faith, that's the liquidated damages issue. What was the county supposed to do about it that they didn't do? In other words, if they're not cutting the checks, what are they supposed to do to get the overtime paid to these people? That's the question I have about those two issues. Thank you, Eric. First, as to the good faith defense, it's a statutory defense, and it's very narrow. And so it doesn't ask could have, should have, what should the county have done differently. It only asks whether the county believed that the payment was in compliance with the law. And here the record shows that the county knew that the payment was not in compliance with the law. No, the county's hands were tied, though. So how can we find that the county did act in good faith when it didn't have the ability to pay? Because you're saying it's no fault, it's strict liability? The presumption under the FOSA is that all cases will have liquidated damages. There is a very narrow exception to liquidated damages, which is outlined in the good faith defense. And the county did not meet the statutory terms of the good faith defense on the evidence here. What would they have had to do to meet the good faith requirement? If they did, if they believed that they were in compliance with the law, and they entered evidence showing that they believed they were in compliance with the law, and that was objectively and subjectively reasonable, then they could meet the good faith defense. If the county had sent like a memo to the state saying, hey, state, you should be paying these people more money because they're entitled to it under the FLSA, would that have been enough to discharge its burden? Not under the good faith defense because the wages weren't paid. And I think it's important here to understand the balance of the equities. The question is, when there's work being performed and wages aren't properly paid, should the employee suffer or should the employer be let off the hook? And the elephant in the room here is that the state has the sovereign immunity, and that's why you can't sue the state. Why couldn't you sue the state in the state court? Under all the new name, the venue doesn't have it. In the court, so in the court. Why couldn't you sue them in the state court? There is still sovereign immunity in the state court. Under state law. You wouldn't sue a 1983 case. You'd just sue them in state court for not paying. No. There was no state law claim at this point in time. There was only a federal one. I see. Isn't there a parallel state statute? There is a parallel state statute. It was changed later, and so they changed it. Counsel, is there a case that supports your argument that absent a belief that the actions are lawful, the good faith exception is unavailable? Is that your interpretation of the statute, or is there a case that interprets the statute in that way? That's our reading of all of the cases that we cited in our brief. Give me your strongest case to support the proposition that so long as the employer cannot say that it believes its actions are lawful, it is not entitled to a good faith defense. What's your strongest case that states that proposition in that way? The strongest case? If I was in that circuit case, I'd look to a R.O. case. A T.R.O. R.I.D.W. A.J.R.O. A.J.R.O., okay. My question, which I understand isn't directly relevant, but why couldn't you see the state under the F.L.S.A. in state court? You can't do that. I don't know the 1983 under the F.L.S.A. directly. Those were actually the facts in Elvin v. Wade. The case was removed from state court. The F.L.S.A. The case was originally filed in state court. It was an F.L.S.A. case, and the whole thing is that the venue doesn't matter. So the other question I was going to ask was the county, it appears, could not have paid. There was just no way the county could have paid this money. So you do have a big problem on the good faith end of this issue. Go ahead. I would say you're on a mission. Go ahead. All right. I would say that willfulness and good faith are different, and the inquiry has to be different. So there's a narrow statutory defense under good faith, and willfulness is our burden. On good faith, our point is that the county can't meet the narrow statutory definition of the affirmative defense. And on willfulness, the county knew that the payment was not paid. But good faith, that's the problem. It's hard to be willful for something you didn't accomplish. The other practical question I have is I assume that if the county is held liable, the state's going to pay the money, in fact. Is that right? Well, there's evidence in the record that this state did do that when the county was found liable for state wage and hour violations. So we don't know what this state and the county are going to do. For one thing, the state has a big chunk of the county's money in front of them, so you think they'd have to pay it. It's really complicated. Counsel, before you conclude, could you point me to the precise language in Harrell that you're relying upon to say that so long as the employer does not believe that his conduct is lawful, that there can be no good faith? I'm curious about what that specific language is because I didn't see it. Well, I think the portion that we cited I think gets to the concept. Just point me to the language that you're relying upon to support that proposition. It's at page 1258, and the quote is, an employer who knows of a risk that his conduct is contrary to law yet disregards that risk as willfully. Well, no, I'm talking about good faith. You were talking about good faith and the fact that if they did not believe their conduct was lawful, they were not acting in good faith, so I'm asking you for that language. I'm sorry, Your Honor. I'm sorry, I was in the wrong section. That language, in our view, is in the statute. It's 29 U.S.C. Okay, we're back to where you started because I asked you if that was your interpretation of the statute or if you had a case and you told me how or what's the case that said it. So, I understand your argument. Okay, your time is up. Thank you. Of course, we will give you one minute to rebuttal. Thank you very much. Okay. National. National. National. County, may it please the Court. Cutting out. The district judge correctly concluded that the county does not employ people. Can you keep cutting out? No, because we can't hear you when you lean back. Can you hear me now? Yes, but you're going to stay there. Okay. Okay. May it please the Court. The district judge correctly concluded that the county does not employ the IHSS provider. Is it a detailed analysis? Well, first of all, the county was wrong about me. The district court was quite wrong about the NED and which category of payment was involved there. I was directly wrong about that. Well, I think the district judge got twisted the same way your Honor was somewhat perplexed by the labeling. I was. Yes, I'm perplexed by the language, but he is wrong about what Bonnet held. Bonnet said it was the third category, and there were instances in Bonnet, moreover, where the recipient was not getting the money, but the county was paying the money. So the reason I think the district judge thought it was the first category was because Bonnet was about a county paying a provider. No, but it wasn't. Yes, it was sometimes about the county paying the provider, right? It was a mistake to call it the first category. It was the third category. But factually, the money in Bonnet was going from the county to the provider. That does not happen here. No. But that has nothing to do with the categories, and the county does choose the category. But that's a matter of state law, and it's just a matter of frame. It's not an employer-employee relationship decision. So I get that this case is not exactly like Bonnet, that there were differences in the program between then and now, but the part I'm having a hard time with is how this is a summary judgment case. The way it looks to me is that there's a pile of facts on your side, and there's a pile of facts on the plaintiff's side, and the whole question is how all that gets weighed and filtered out, and it just doesn't strike me as something that ought to have been decided on summary judgment. What am I missing? You're missing what happened. The district judge credited all of the plaintiff's evidence. It disregarded any county evidence that plaintiffs objected to. It applied deferential review standards, more beneficial for the plaintiff than would have happened in a bench trial. It parsed through an extensive evidentiary record, and it made specific findings of fact. They don't point to material disputes. Well, they don't show debate. The findings of fact. Sorry. If the court takes that approach, you're going to force a busy trial judge to go to bench trial on a judge. It's an apology because district courts can't make findings of fact in summary judgment. By the way, that's what I signed up for. Okay, so. No problem. But there's no contesting that the facts are undisputed. It is very often that undisputed factual findings drive labelable conclusions on summary judgment. That's what happened here. These facts were undisputed. It would be helpful to me if you would tell me what is different from Bonet and why whatever is different is sufficient to have it come to a different conclusion. Because Bonet was grouping together the appellants. Throughout the analysis, it does not differentiate between a state and a county. A case of not authority for a proposition not considered. Bonet did not consider. What if you concluded the county was an employer and did not? If you considered them both employers, but it didn't differentiate. I.e., that there were joint employers, which is what the question is here. Well, no, it's not. The question is not whether the state and the county combined employed the provider. The state's not here because of immunity. And it's about whether the county standing alone is an employer. No, no. I'm sorry. It's a joint. Well, yes, but the joint employer concept encompasses the fact that neither of them has to do everything that an employer does. They only have to do certain things. I agree. But Bonet didn't address this issue, and that's why it's not authority for it. Moreover, the program's different. The county paid directly to the provider in Bonet. Now, the fact that Gray says, as employers of the home care providers, the state and county must comply with the FARES commitments, I understand what you're saying. In connection with the petition for rehearing the Ninth Circuit, and Gray clarified it was not making any determination as to the employer's status. And, indeed, at oral argument, counsel specifically acknowledged that issue was not before the Ninth Circuit. But you had language with Gray in saying that it did make determinations. Gray said that the county had no ability to pay. Well, either it was making determinations or it wasn't making determinations. It made that determination, and it's undisputed. It's undisputed. You don't hear counsel saying the county can pay. The state controls payroll. This is an overtime case, and counsel's accepting control over the payroll is not a big issue. It is the issue. Many employers contract out the payroll to companies, payroll companies, and the payroll is paid by the payroll company. Yes, but that's not the case. The state issues time cards. The state requires providers and recipients to approve and complete those time cards. They're then sent to the state, and the state issues payment. There's no higher requirement. Can I get back to the summary judgment question again? So was Bennett decided on the summary judgment motion? No. It was decided after a trial, right? Yes. Okay. But there are no facts. So a trial is not going to advance this record. There are disputes about how significantly you weigh facts. I mean, your opponent listed a list of things that the county does, determines the task, determines the amount of time, determines the total number of hours per month, approves deviations, designed some of the training materials, inspected places of employment. And it's a question of whether that adds up to how you weigh that in counter or juxtaposition to the fact that it's the state that's actually cutting the checks. So it's not like it's just there's nothing to decide here. It's a question of whether this pile of facts that the plaintiff cites, how it's weighed, and whether it adds up to enough. And I'm just having a hard time how that's a summary judgment question, just as it was in Bennett. It happened to come up on a bench trial, but they're not arguing that there are material disputes. Nobody moved for a summary judgment in Bennett. I guess we can figure that out. I don't know, Your Honor, but I do know that the things that they're pointing to are not factual. Well, but what about? They're not eligibility determinations that are focused on the person's MPA. Even as for the money, a big chunk of the money is county money. And the county both chooses the method of payment and can set the wage rates, right? No, Your Honor. Well, you can negotiate with the union to set the wage rates, and there is some approval by the state, but we have no idea. Maybe this is a little worse on the summary judgment issue, how rubber-stampy that is. It appears it's fairly rubber-stampy. Well, Your Honor, respectfully, there are errors I must correct here. First, the county pays a small, small percentage. Thirty percent or so is what I can tell you. No, it's more like three percent. A huge amount, 90-something percent of the funding of this program comes from the state and the feds. The states send money back to the county, and the county sends it back to the state. Oh, so you're not counting that money, you're not counting the money that the state sends to counties. It's state money. But I'll note they're sending it sort of generically and then it's coming back specifically. No, it's a specific funding mechanism for this program governed by state law, that it's state money that goes to the counties, and then the counties remit it pursuant to a formula set by the state. But when you zoom out, this was briefed in Grade 1, the county is taking probably about three to five percent of this cost. How much each year is the county contributing from county coffers to this program? There is no specific evidence that the net actually unique county money that's going in. There's evidence of hundreds of millions that are changing hands, but like I said, the record is that that's primarily state funding that's allocated and then remitted. The facts, when you ask for the best facts for the plaintiff, they're talking about tasks and time. Well, I mean that point. You said that the county is contributing roughly three percent. Where are you getting that percentage? That was not a huge focus of the briefing in this appeal, but in the prior appeal as to immunity to establish that the state coffers in this program, there was extensive briefing about the funding mechanism. But where did we go to confirm that in this record, if that's one of the issues of concern? Where in this record may we go to find that? It would be in the background briefing in connection with the Rule 12 motions. So I don't know that I have the appendix site for you here. I mean, for example, could the other point about the collective bargaining process, could the county have to negotiate with the union for this very overtime pay? The county does not negotiate with the union. That's a separate entity path. Well, but it's controlled by the county and the county board of supervisors directs it, as I understand it. It's an independent entity that serves as the employer for collective bargaining reasons. The county does not set wages in any way. All the county can do is decide that it wants to support an increase for wages. And then it goes through a state approval process because it's a state program, and the money comes from the state. The eligibility analysis, their best fact to show an addition of employer status is about the recipient's health needs. The provider is not in the equation. The employer analysis focuses on the power to hire and fire. That relied with the recipient. It focuses on the control over the work environment. But those things were all true in Bonet, right? No, Your Honor. It was different. The counties verified the hours in Bonet. That does not happen here. The counties can hire and fire in Bonet. That does not happen here. Is that true? I didn't think that was true. It's true, Your Honor. It was true maybe as to the people they hire directly, but not as the people that the recipients hire and fire. That's what the facts of Bonet are referencing, and it does not have the granular detail that's in this record because the district judge here parsed out the way this program actually works in L.A. County now, not how it worked in other counties 40 years ago. The hourly rate was established by the counties there. They paid providers directly. None of those facts are here. And more importantly, Bonet was not looking at the kind of counties that are distinct from the state. Here, the court had to. It had to look at what the county is actually doing. Interfacing with recipients and determining the appropriateness of their health care, if not the employer relationship, the economic reality of this case, if the county could not pay overtime, does not control payroll, does not dictate hours, has no supervision of the work environment, does not maintain the employment records that govern this relationship. As to each or at least some of the things you're saying, there is detail which could be said otherwise. They maintain some records. They do determine what the providers are going to do in the house because they decide what the tasks are of their recovery. And as Judge Connelly says, the question is which of those pieces matter. Does it matter that they keep some records? Does it matter that they do determine the actual tasks and, therefore, the number of hours that the provider can work for each recipient? You're both kind of pushing the facts to the margins, as constituents do, in your favor, but they're more articulated than you're saying and perhaps more articulated than your thoughts there as well. But there are no material disputes. I mean, this is a summary judgment appeal, and the plaintiff's not arguing that there were credibility calls. They needed a trial. I understand that, but then you should be very specific in the way you state. It's not true that they don't keep any records. They keep some records. Summary judgment isn't just about whether there are credibility calls. It's about weighing. That's the other big part of things that judges like me aren't supposed to do on summary judgments, weigh evidence. But it's a legal issue for the court on a bench trial, Are you saying that a court on a bench trial doesn't decide facts? I think the court does. And then the court also weighs facts, right? Yes. In other words, going back to what Judge Berzon just said, the judge would have to decide whether the fact that the county kept some records but not all the records made a difference or not. He did make those conclusions based on the undisputed facts in this record. Okay, thank you. And at the end of the day, the question is, whether giving every inference to the plaintiffs, they could show that the county did enough substantive control or authority or discretion to satisfy the employer standard under BEMET. This is not a case that was decided there. It's a fact, undisputed record here, that shows that the county does not operate as an employer within the meaning of the infill estate. For all of those reasons, I respectfully submit this matter should be affirmed unauthorized. Judge Berzon asked an interesting question to your opponent at the end. I'm just curious about it. So if the county ended up losing this case, who ends up paying? If the county, it will be the judgment debtor. It will be the judgment debtor, yeah. There's no certainty as to how that would work. And I also thought it would be helpful to maybe ask a question about Baldwin. The reason the state has sovereign immunity is because Congress does not have the ability to legislate through the FLSA to make the states liable in the context of those claims. But they have a remedy. If the state is their employer, they can get an administrative remedy for overtime. They chose not to. They chose to bring in, like, the state corporate labor or something like that. Yeah, exactly. If you are an employee of the state of California and you believe you're owed overtime under the FLSA, there can be an administrative action from the DOL to pursue your remedy. You shouldn't get to do an end-run around sovereign immunity, and you shouldn't get to sue the social workers of the county who are merely agents of the state in a very minimal administrative role supporting the recipient. Well, they're minimal, but there are hundreds of employees who are doing something. What are they doing with their hundreds of employees? The social workers are looking at the recipient eligibility. And that's not all they're doing. They're dealing with their providers, and they have a large number of people who are doing nothing but answering calls from their providers, as I understand it. They answer calls about the state's program, but that doesn't make them control. They have to have control to be employers. At the end of the day, the common law test is focused on the principles of control and authority, and that evidence is not here. But the county is certainly the interface with the providers. Providers don't have any relationship with the state as such. They send things to the state, but who will they deal with? With the county people. Is that right? Very rarely. They're primarily... Why are there hundreds of people answering phone calls? The record says that, particularly on this issue, they revved up and hired a large number of people to answer phone calls from providers. Is that not true? I think it's problematic to rely on the implementation of new overtime rules to establish employer status before overtime rules were in place. It is suggestive of where, at least from the provider's point of view, the authority lies. No, that's not in this record. What they're talking about is the county's efforts to implement a ground-shaking change in the law after the relevant time period for their clients and on issues not relevant to their work environment. It's about what their work environment is under the bonus factors and the recipient and the state, the WIC code, that they provide that the state is the employer. To suggest that state law can be disregarded in analyzing a state program to determine who the employer is, that's a disrespect to the holistic analysis of the economic reality that the courts are supposed to employ under WIC. So for those reasons, I think that the undisputed fact and the factors all lay in favor of the county on this issue. Thank you, Your Honor. Okay. Thank you very much. You've been very helpful. Let me talk to your opponent one minute or about all of you. Thank you. Thank you, Your Honor. We agree there are no undisputed facts here, and it is a bench trial below. And so we don't have any expectations. What do you mean it's a bench trial? What do you mean by that? It was a bench trial? It's a bench trial. It's a bench trial. It would be a bench trial if it went to trial. Is that what you're saying? That's correct. It would be a bench trial. You're not saying there was a bench trial? No, no. Thank you for that clarification. If the case is remanded and for trial on the joint employer question, it will be a bench trial on that issue. The second point I'd like to make is that the money does come from the county, and it comes from the county's general budget. The deposition of Victor Zamarripa covers this. It's in Record Volume 6. So the budget is moving back and forth. It's a mystery. But the money that is coming from the state to the county is general money? Is that what you're saying? That's correct. The state has saved the county, and then the county then allocates it and sends it back to the state for this purpose. Is that your representation? That's correct. And what the record shows is that second piece, that that's a general budget allocation every single year from the county's general budget to allocate money that is sent to the state for the purposes of paying provider wages. And it's 300. You're saying the entire $300 million comes out of the county's general fund? That's correct. With no subsidy from the state? There is no direct subsidy from the state that directs the money to be sent in that way, and it's in the record. Is the subsidy measured by the number of IHSS recipients, or what is the subsidy? We don't know because the county didn't put it in the record. All we know is that every year from the general county treasury, there is an apportionment of $300 plus million to go for IHSS provider wages. That's what's in the record. The record does not reflect how much of that has first come from the state and is being paid back to the state from the county. It doesn't, and since the money comes from the general operating budget, if money comes from the state, it's put into the general fund, and that money comes out of the general fund. There's nothing in the record that shows a tie between an inflow from the state and the general funds that are allocated by the county. On deciding the rates, if the court goes back to the district court decision in BNET, the structure was the same. The county set the rate. The state had to approve the rate. That's in the BNET district court decision. What about on hiring and firing? The Court of Appeals opinion in BNET is kind of wishy-washy about that. It says, in the end, we don't really know what happened with hiring and firing. That's correct, and the important point is that it is the same. The recipient had the ability to hire, and the recipient had the ability to fire. In BNET, and now, and what this court said in BNET, is that the county's structural control over the program itself, that there could be no hiring if the program didn't exist. There may be some suggestion that the county, well, in BNET, it seemed that the county might take over the hiring and firing role if the individual was not able to do it. Is that still true? That's correct. The way that's handled now is through a county delegated public agency. There's a fourth entity that we haven't been discussing that's a public agency that is actually the employer for collective bargaining purposes. They also fill in this problem in terms of finding providers for people who can't do it themselves. That's correct. Are they agents of the county? They are. They are hired by the parent on contract. And are they supervised by the county? If they did not perform that function, the county would have to perform it. So the county controls that contract. Does the statute require that there be a separate entity for collective bargaining purposes, or just allows it? The statute, to my recollection, requires that either the county does it itself, or the county has, as I said, an agency. Okay. Thank you very much. You've both been very helpful about a very, very complicated situation. Thank you. The case of Gray v. Los Angeles County Department of Public Social Services is submitted. We will go to Wyatt v. Anbeck.
judges: BERZON, RAWLINSON, Kennelly